ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 14 CRIM 272

UNITED STATES OF AMERICA  :   Indictment
:   Crim. No.
:
v.   :   VIOLATIONS:  18 U.S.C. Sections 1349
:   (Conspiracy), 1343 (Wire Fraud) & 2
:   (Aiding and Abetting), and Forfeiture.
:
PAUL ROBSON,   :
PAUL THOMPSON, and   :
TETSUYA MOTOMURA.   :
:   USDC SDNY
Defendants.   :   DOCUMENT
:   ELECTRONICALLY FILED
    DOC #:_____
    DATE FILED:_____APR 2 8 2014

## INDICTMENT

The grand jury charges that, at all times relevant to this Indictment:

### COUNT ONE
#### (Conspiracy)

##### General Allegations

1.    The London Interbank Offered Rate ("LIBOR") was a benchmark interest rate overseen by the British Bankers' Association ("BBA"), a trade association based in London, United Kingdom representing approximately 200 banks from more than 60 countries.

2.    LIBOR was calculated every London business day by averaging the interest rates at which designated banks ("Contributor Panel" banks) estimated that they could borrow unsecured funds from other banks across ten currencies, including the Japanese Yen ("Yen"). Contributor Panel banks for each currency submitted their estimated borrowing rates for fifteen different borrowing periods ("maturities" or "tenors"), ranging in length from overnight to one year, including maturities of one month, three months, and six months (commonly referred to on paper as "1m," "3m," and "6m").  Thomson Reuters, acting as an

1

agent for the BBA, received electronically the Contributor Panel banks' estimated interest rate submissions at or before approximately 11:10 a.m. in London. Among other currencies, Thomson Reuters received estimated interest rate submissions for the Yen LIBOR from sixteen designated Contributor Panel banks, specifically from bank employees referred to as "submitters" or "setters." Upon receipt of the sixteen Contributor Panel banks' Yen LIBOR submissions, Thomson Reuters: (a) ranked the submissions from highest to lowest; (b) excluded the four highest and four lowest submissions; and (c) averaged the remaining middle eight submissions to determine the official Yen LIBOR setting (also referred to as the "fix") used to settle trades and as a reference rate for various financial products. This process was repeated for each different maturity or tenor. Contributor Panel banks' Yen LIBOR submissions went to between two and five decimal places, and the published Yen LIBOR fix was rounded, if necessary, to five decimal places. In the context of measuring interest rates, one "basis point" (or "bp") was one-hundredth of one percent (0.01 percent).

3.   By approximately 12:00 p.m. in the United Kingdom, Thomson Reuters published the averaged rates - or LIBORs – to, among others, Bloomberg LP network equipment which thereafter transmitted the LIBORs to servers located in New York, New York and elsewhere. Thomson Reuters as a general matter, pursuant to service agreements with various clients, transmitted the rates to servers and traders of LIBOR-based financial products around the world, including to those located in New York, New York and elsewhere.

4.   The published LIBOR rates were used as the basis for the pricing of fixed-income futures, options, swaps, forward rate agreements, and other derivative instruments.

5.   Interest rate swaps involved an agreement between counterparties to exchange payments in the future:  one counterparty pays a fixed rate while the other pays a variable one.

Generally, the fixed rate was agreed upon at the outset by the counterparties and the variable rate was set at some point in the future. Often times, the variable rate was based on a reference rate such as Yen LIBOR. The actual value of the contract could not be determined until the date on which the variable rate was set. At that point, payments were exchanged, and, depending on the value of the variable rate, one party made money and the other lost money.

6.    Traders made predictions on where LIBORs would set in the future. Traders, on behalf of their respective financial institutions, often entered into multiple derivatives contracts containing LIBORs as a price component based on those views. Therefore, the profit and loss that flowed from those contracts was directly affected by the relevant LIBORs on certain dates. If the relevant LIBORs moved in the direction favorable to the trader's position, the financial institution and the trader benefitted at the expense of their counterparties. When the traders' predictions were wrong and LIBOR moved in an unfavorable direction, the traders and the financial institutions stood to lose money to their counterparties.

7.    Because traders often took large derivative positions, even small moves in the LIBOR fix could result in large swings in profits or losses from trades.

8.    In addition to being used to price derivative products, financial institutions and other lenders in the United States and elsewhere frequently used LIBOR to set their own reference interest rates for financial instruments and consumer lending products, which included mortgages, credit cards, and student loans, among others.

9.   A Contributor Panel bank's submission was to be an independent estimate of that bank's borrowing costs, and not altered to reflect trading positions that stood to gain or lose based on LIBOR rates.

10.   Because LIBOR was calculated as an average of banks' submissions, if a bank coordinated its submission with another Contributor Panel bank, it could affect the fix more significantly than if it manipulated only its own submission.

11.   One of the Yen LIBOR Contributor Panel banks was Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank"), a financial institution and global financial services company headquartered in Utrecht, the Netherlands with an FDIC insured branch located in New York, New York.

12.   From at least in or about May 2006 through at least in or about early 2012 Trader-R was a Senior Trader on Rabobank's Money Market/FX Forwards desks in Tokyo, Japan and elsewhere in Asia.  Trader-R traded derivative products that referenced Yen LIBOR.  Because these trades were settled based on the published Yen LIBOR, the profitability of Trader-R's trading positions depended on the direction in which Yen LIBORs moved.

13.   Another of the Yen LIBOR Contributor Panel banks was Bank-A, a global financial services company headquartered in London, United Kingdom.

14.   Submitter-A worked for Bank-A as a trader from at least May 2006 to at least October 2008.  At times while employed at Bank-A, Submitter-A was responsible for making the bank's Yen LIBOR submission.

15.   Another of the Yen LIBOR Contributor Panel banks was UBS AG, a financial institution located in Zurich, Switzerland. Tom Hayes worked for UBS AG as a trader from at least July 2006 to at least September 2009.

16.   Bank B was a federally chartered and insured financial institution within the definition of Title 18, United States Code, Section 20 and was headquartered in Charlotte, North Carolina.

The Defendants

17.   From at least May 2006 through at least November 2008 defendant PAUL ROBSON a/k/a "Pookie,"a/k/a "Pooks" ("ROBSON") worked as a Senior Trader at Rabobank's Money Markets and Short Term Forwards desk in London.  From in or about January 2006 until at least November 2008, he served as Rabobank's primary submitter of Yen LIBOR to the BBA.  Starting sometime in 2009, ROBSON worked at a brokerage firm in the United Kingdom and thereafter moved to a London-based office of a Japanese bank.  At times during that period, ROBSON traded derivative products that referenced Yen LIBOR. Because these trades were settled based on the published Yen LIBOR, the profitability of ROBSON's trading positions depended on the direction in which Yen LIBORs moved.

18.   From at least in or about June 2006 through at least in or about October 2008, defendant PAUL THOMPSON ("THOMPSON") was Rabobank's Head of Money Market and Derivatives Trading for Northeast Asia.  In or about October 2008, he was promoted to Executive Director of local currency trading for Asia, and from in or about November 2010 to at least in or about January 2011 he was a Managing Director and head of liquidity and finance for Rabobank Asia.  At times during that period, THOMPSON traded derivative products that referenced Yen LIBOR.  Because these trades were settled based on the

published Yen LIBOR, the profitability of THOMPSON's trading positions depended on the direction in which Yen LIBORs moved.

19.  From at least in or about May 2006 through at least late 2010, defendant TETSUYA MOTOMURA a/k/a "Moto man" ("MOTOMURA"), was a Senior Trader at Rabobank's Tokyo desk.  During that time, MOTOMURA supervised money market and derivative traders employed at Rabobank's Tokyo desk, including, at times, Trader-R and Submitter-A.  MOTOMURA traded derivative products that referenced Yen LIBOR.  Because these trades were settled based on the published Yen LIBOR, the profitability of MOTOMURA's trading positions depended on the direction in which Yen LIBORs moved.

<u>The Conspiracy</u>

20.  From at least in or about May 2006 through at least in or about early 2011, in the Southern District of New York and elsewhere, PAUL ROBSON, PAUL THOMPSON, and TETSUYA MOTOMURA, the defendants, together with Trader-R and others known and unknown, did knowingly combine, conspire, confederate, and agree to commit certain offenses against the United States, that is:

(A)  to devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and to transmit and cause to be transmitted certain wire communications in interstate and foreign commerce for the purpose of executing the scheme; to wit, the defendants engaged in a scheme to manipulate and attempt to manipulate the benchmark interest rates referenced by derivative products throughout the financial industry to their advantage, by the dissemination, and submission, of false and fraudulent statements intended to

6

influence and manipulate the benchmark interest rates to which the profitability of interest rate derivative trades was tied, and the defendants contemplated, foresaw, and caused use of wires in interstate and foreign commerce in carrying out the scheme, in violation of Title 18, United States Code, Section 1343; and

(B)  to execute and attempt to execute a scheme and artifice to defraud a financial institution, the deposits for which were at the time insured by the Federal Deposit Insurance Corporation; and to obtain and attempt to obtain moneys, funds, credits, assets, and other properties owned by and under the custody and control of a financial institution by means of materially false and fraudulent pretenses, representations, and promises, as well as by omission of material facts in violation of Title 18, United States Code, Section 1344.

The Scheme

21.  From at least in or about May 2006 through at least in or about early 2011, PAUL ROBSON, PAUL THOMPSON, and TETSUYA MOTOMURA, the defendants, together with Trader-R and Submitter-A, and others known and unknown to the grand jury, intending to manipulate and attempt to manipulate the benchmark interest rates referenced by derivative products throughout the financial industry to their advantage, engaged in a scheme to obtain money and property by making false and fraudulent Yen LIBOR submissions to the BBA for inclusion in the calculation of Yen LIBOR.  The scheme had an effect on one or more financial institutions, within the meaning of Title 18, United States Code, Sections 20 and 3293(2). The conduct of the conspirators caused Rabobank and other financial institutions to be susceptible to substantial risk of loss and to suffer actual loss. In particular, Rabobank

agreed to pay approximately $325 million in penalties to the United States Department of Justice as a result of the conduct.

<u>Manner and Means</u>

22.   In order to further the objects and goals of the conspiracy, defendants PAUL ROBSON, PAUL THOMPSON, and TETSUYA MOTOMURA  together with Trader-R and Submitter-A and others known and unknown to the grand jury used the following manners and means, among others:

a.   From at least May 2006 through at least November 2008 ROBSON had primary responsibility for making Rabobank's Yen LIBOR submissions to the BBA.

b.   ROBSON, THOMPSON, MOTOMURA, and Trader-R traded derivative products whose value was tied to the Yen LIBOR fix.

c.   THOMPSON, MOTOMURA and Trader-R requested that ROBSON and other Rabobank Yen LIBOR submitters make Yen LIBOR submissions that benefitted their trading positions.

d.   ROBSON often accommodated such requests by making and causing false and fraudulent Yen LIBOR submissions to be made.  Sometimes ROBSON submitted rates at a specific level requested by a co-defendant or Trader-R and consistent with the requester's interests.  Other times, ROBSON made a higher or lower Yen LIBOR submission consistent with the direction requested by a co-defendant or Trader-R and consistent with the requester's interests.  On many occasions, ROBSON'S  manipulated Yen LIBOR submissions were to the detriment of, among others, Rabobank's counterparties to derivative contracts.

e.  In addition to manipulating Rabobank's Yen LIBOR submission on behalf of one or more co-defendant or Trader-R, ROBSON, on occasion, coordinated his Yen LIBOR submission with Submitter-A.  At times ROBSON submitted Yen LIBOR at a level requested by Submitter-A, and, at other times, Submitter-A submitted Yen LIBOR at a level requested by ROBSON.

f.  On many occasions, the combined effect of Rabobank and Bank-A's false and fraudulent submissions moved the Yen LIBOR fix more than it otherwise would have if Rabobank alone submitted manipulated rates.

g.  After January 2009, when Rabobank's Yen LIBOR submitters moved to Utrecht, and until at least November 2010, Trader-R continued to send multiple requests for Yen LIBOR rates that benefitted his trading positions to the Rabobank submitters for them to submit to the BBA.

<u>Overt Acts</u>

23.  In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

<u>May 10 and May 11, 2006</u>

24.  On or about May 10, 2006, ROBSON stated to Submitter-A that, "for info i've been asked by my singapore man [THOMPSON] to help him out with a silly low 6m fixing today."

25.  Later that same day, ROBSON admitted to Trader-R, "it must be pretty embarrasing to set such a low libor  (I was very embarrased to sey my 6 mth – but wanted to help thomo [THOMPSON]). tomorrow it will be more like 33 from me."

9

26.   On or about May 10, 2006, Rabobank submitted a 6-month Yen LIBOR rate of 0.26 percent, which was one basis point lower than the previous day, moving Rabobank's submission down from the panel's second highest to tied for second lowest, while the other panel banks submissions increased by an average 7 basis points.

27.   On or about May 11, 2006, the following day, THOMPSON thanked ROBSON "for yest" and indicated that he needed "6 mth Libor" low again.

28.   On or about May 11, 2006, Robson responded, "6m sets at 31 today mate…will put in something rediculously low again tho – no probs."

29.   On or about May 11, 2006, Rabobank submitted a 6-month Yen LIBOR rate of 0.28 percent, remaining at second lowest.

May 19, 2006

30.   On or about May 19, 2006, after THOMPSON informed ROBSON that his net exposure for his 3-month fixes was 125 billion Yen, he requested that ROBSON, "sneak your 3m libor down a cheeky 1 or 2 bp" because "it will make a bit of diff for me."

31.   On or about May 19, 2006, ROBSON responded, "No prob mate I mark it low."

32.   On or about May 19, 2006, Rabobank submitted a 3-month Yen LIBOR rate of 0.17 percent, four basis points lower than Rabobank's submission the day before, moving its submission from the panel's second highest to tied for the lowest.

July 27, 2006 and July 28, 2006

33.   On or about July 27, 2006, ROBSON wrote to Submitter-A, "morning skip….my little yellow friend in tokyo [Trader-R] wants a high 1m fix from me today….am going to set .37 – just for your info sir."  To this, Submitter-A responded, "that suits me mate as got some month end fixings so happy to ablige..rubbery jubbery.:-O"

34.  On or about July 27, 2006, Bank-A submitted a 1-month Yen LIBOR rate of 0.37 percent, two basis points higher than Bank-A's submission the day before, moving its submission from tied for the panel's lowest to tied with Rabobank for the second highest submission.  Rabobank also submitted a 1-month Yen LIBOR rate of 0.37 percent.

35.  On or about July 28, 2006, after ROBSON wrote to Submitter-A, "morning skipper.....will be setting an obscenely high 1m again today...poss 38 just fyi."  Submitter-A responded, "(K)...oh dear..my poor customers....hehehe!! manual input libors again today then!!!!"

36.  On or about July 28, 2006, Bank-A and Rabobank both submitted 1-month Yen LIBOR rates of 0.38 percent, which tied them for the second highest submission that day on the panel.

<u>November 8, 2006 and November 9, 2006</u>

37.  On or about November 8, 2006, THOMPSON stated to ROBSON, "Got a few big 3mth fixings in next 2 days, any chance you cud bump it up a couple? What do u actually think 3mth today 45.25 – 45.5 ish?"

38.  On that same day, ROBSON responded, "will set them high and dry skip."

39.  On or about November 8, 2006, Rabobank submitted a 3-month Yen LIBOR rate of 0.46 percent, which was 3 basis points higher than its previous day's submission, moving it from tied for the panel's second lowest to tied for the panel's third highest.

40.  On or about November 9, 2006, the following day, THOMPSON stated, "Thx skip. 1 more today -- 3mths."

41.  On that same day, ROBSON responded that he would set it high again asking "is 46 lvl ok or higher?"

42.  On or about November 9, 2006, Rabobank again submitted a 3-month Yen LIBOR rate of 0.46 percent, keeping Rabobank's submission tied for the panel's third highest.

December 13, 2006

43.  On or about December 13, 2006, THOMPSON stated to ROBSON, "Wouldn't mind slightly higher 1m and slightly lower 6m if you have any room over the next 5 days..got a few biggies rolling off."

44.  On or about December 13, 2006, Rabobank submitted a 1-month Yen LIBOR rate of 0.48 percent, one basis point higher than Rabobank's submission the day before, moving Rabobank's submission from the middle of the panel to tied for the panel's third highest.

45.  On or about December 13, 2006, Rabobank submitted a 6-month Yen LIBOR rate of 0.60 percent, 4 basis points lower than Rabobank's submission the day before, moving Rabobank's submission from the middle of the panel to the panel's lowest.

December 18, 2006

46.  On or about December 18, 2006, after Trader-R informed THOMPSON that he needed a high 1-month, THOMPSON responded that he would tell the person he believed to be submitting rates that day "to put a high 1s for you."   THOMPSON further clarified that he will inform the backup submitter, "for choice put it higher rather than lower" and explained "I don't like to tell them in too black and white but Pookie [ROBSON] always understands."

47.  On or about December 18, 2006, THOMPSON sent an email to the senior trader he believed to be submitting Rabobank's Yen LIBOR rates that day, stating, "your in the yen libors hot seat in Pooks absence. If in doubt can you go higher on 1m and 3m please as both myself and Tokyo are very long these fixings today so every little bit helps."

March 22 and March 23, 2007

48. On or about March 22, 2007, ROBSON told Submitter-A that he needed a high 1-month Yen LIBOR "set tomorrow" and stated, "if you can ask your man to set a nice high one like today pls?"

49. On or about March 22, 2007, Submitter-A forwarded ROBSON's message to a colleague at Bank-A stating, "We usually try and help each other out…but only if it suits."

50. On the following day, on or about March 23, 2007, Bank-A submitted a 1-month Yen LIBOR rate of 0.76 percent, the same rate as the previous day, keeping Bank-A's submission as the highest on the panel.

March 26, 2007 through March 30, 2007

51. On or about March 26, 2007, THOMPSON asked ROBSON, "On libors, this week have a fair bit of 6mths rolling off, I am short so if you can discreetly drop your 6m by 1-2 bp without any trouble would be great – if not no probs mate."

52. On that same date, ROBSON responded, "sure no prob – all my stuff is mainly 1 mth so will keep that high and drop 6's cheers."

53. On or about March 26, 2007, Rabobank submitted a 6-month Yen LIBOR rate of 0.74 percent. Over the course of that week, Rabobank's 6-month Yen LIBOR submissions dropped four basis points and went from being tied for second highest on the panel to being tied for lowest on the panel. Rabobank's 1-month Yen LIBOR submission on March 26, 2007, stayed at the same level as the previous day and was tied for the second highest of all panel banks.

June 15, 2007

54.   On or about June 15, 2007, THOMPSON asked ROBSON, "can you try to keep your 6m high today?"

55.   On or about June 15, 2007, after ROBSON told Trader-R, "thomo wanted a high one," Trader-R stated, "Thomo should have told me this. I wanted them to be lower."

September 21, 2007

56.   On or about September 21, 2007, Trader-R asked ROBSON, "wehre do you think today's libors are?  If you can, I would like 1mth libors higher today."  ROBSON responded, "Bookies reckon 1m sets at .85."

57.   On or about September 21, 2007, Trader-R informed ROBSON, "I have some fixings in 1mth so would appreciate if you can put it higher mate."

58.   ROBSON answered, "No prob mate let me know your level." After Trader-R asked for "0.90% for 1mth," ROBSON confirmed, "Sure no prob…I'll probably get a few phone calls but no worries mate…   there's bigger crooks in the market than us guys!"

59.   On or about September 21, 2007, Rabobank submitted a 1-month Yen LIBOR rate of 0.90 percent, which was 7 basis points higher than the previous day, moving Rabobank's submission from the middle of the panel to the panel's highest.

October 30, 2007

60.   On or about October 30, 2007, ROBSON asked MOTOMURA, "Do you want me to set anything for you?"

61.   On that same date, MOTOMURA replied, "if it is lower, it's better for me" and asked for "low 6's, please."

62.  On or about October 30, 2007, Rabobank submitted a 6-month Yen LIBOR rate of 0.98 percent, three basis points lower than Rabobank's submission the day before, moving Rabobank's submission from the middle of the panel to the panel's second lowest.

February 27, 2008

63.  On or about February 27, 2008, Trader-R requested ROBSON submit "1m 0.70% 3m 0.92% 6m 0.98% Please cheers."  ROBSON responded, "Ok will do skip."

64.  On or about February 27, 2008, Rabobank submitted 1-month, 3-month, and 6-month Yen LIBOR rates of 0.70 percent, 0.92 percent, and 0.98 percent, respectively.

March 19, 2008

65.  On or about March 19, 2008, MOTOMURA stated to Trader-R that they had 1650 contracts and asked Trader-R to make the rate as high as possible.

66.  On or about March 19, 2008, Trader-R wrote to ROBSON, "We have loads of 6mth fixings today.  If possible, could you set 6m libor to 1.10% please?  We don't have particular interest in other libors."

67.  ROBSON wrote back, "Sry just to confirm 6m you want at 1.10???  Ok will do that but I will prob get a phone call at I set 02 yesterday and brokers reckon everything a little lower today... indications are... 1m 85 2m 91 3m 975 6m 1.03."

68.  After learning that ROBSON expected the 6-month rate to be 1.03, Trader-R responded, "actually,,, moto man [MOTOMURA] would like 6m to be higher today.....  If it is not appropriate, it is fine mate, I will explain the situation to him."  To this, ROBSON assured, "Well its no prob mate – I can set it that high....It will be quite funny to see the reaction!"

69.  On that same day, ROBSON told Submitter-A that Trader-R needed a "high 6m libor if you can help skip - asked me to set 1.10!"

70.  Also on that same day, Trader-R informed MOTOMURA that ROBSON would submit a 6-month Yen LIBOR rate of 1.1 percent and this would increase the resulting Yen LIBOR fix by 0.1 basis point.  MOTOMURA responded that this was splendid.

71.  On or about March 19, 2008, Rabobank submitted a 6-month Yen LIBOR rate of 1.10 percent, eight basis points higher than Rabobank's submission the day before, moving its submission from the middle of the panel to the panel's second highest.

72.  Because Bank-B had an interest swap agreement with Rabobank, the profitability of which was tied to LIBOR, Bank-B was directly affected by the Yen LIBOR rate on March 19, 2008.

April 17, 2008

73.  On or about April 17, 2008, Trader-R stated to ROBSON, "Moto [MOTOMURA] would like to have 6m libor lower mate."

74.  On or about April 17, 2008, Rabobank submitted a 6-month Yen LIBOR rate of 0.96 percent, which was three basis points lower than the day before, moving Rabobank's submission from the middle of the panel to tied for the panel's third lowest.

April 23, 2008

75.  On or about April 23, 2008, Trader-R requested ROBSON submit "1m 0.68% 3m 0.93% 6m 0.97% pls cheers." ROBSON responded, "Ok will do."

76.  On or about April 23, 2008, Rabobank submitted 1-month, 3-month, and 6-month Yen LIBOR rates of 0.68 percent, 0.93 percent, and 0.97 percent, respectively.

<u>July 18, 2008</u>

77.  On or about July 18, 2008, in an exchange between ROBSON and a broker located in the United Kingdom regarding setting the one-month Yen LIBOR rate, the broker asked ROBSON to submit a rate "as low as possible basically," and told ROBSON that it was for "UBS...Tom [Hayes]."  After offering to set 0.63 percent, ROBSON said "Make sure he [Hayes] knows… you know scratch my back."

78.  On or about July 18, 2008, Rabobank submitted a 1-month Yen LIBOR rate of 0.63 percent, eight basis points lower than the previous day, moving Rabobank's submission from tied for the highest to tied for the second lowest.

<u>July 24, 2008 through July 30, 2008</u>

79.  On or about July 24, 2008, Trader-R asked ROBSON, "Could you set 6m at 0.97% please?  Moto [MOTOMURA] has big fixings over the next couple of weeks so that it would be nice if you could keep it as low as possible for some time."

80.  On that same date, ROBSON affirmed, "Will do mate."

81.  On or about July 24, 2008, Rabobank submitted a 6-month Yen LIBOR rate of 0.97 percent, which was three basis points lower than Rabobank's submission the day before, moving Rabobank's submission from the middle of the panel to tied for the panel's second lowest.

82.  On or about July 25, 2008, Rabobank submitted 0.97 percent which was the panel's second lowest 6-month Yen LIBOR rate.

83.  Rabobank's submission for the 6-month Yen LIBOR rate remained at 0.97 percent-- the second lowest submission-- through July 30, 2008.

August 4, 2008 through August 7, 2008

84.     On August 4, 2008, in a Bloomberg chat, MOTOMURA asked ROBSON,

"Please set today's 6mth LIBOR at 0.96 I have chunky fixing."

On that same day, ROBSON responded, "no worries mate."

85.     On or about August 4, 2008, Rabobank submitted a 6-month Yen LIBOR rate of

0.96 percent, which was three basis points lower than the previous day, moving Rabobank's

submission from tied for the panel's fourth lowest to the second lowest.

86.     On or about August 6, 2008, MOTOMURA stated to ROBSON, "Good Morning.

I have another side of fixing today and tomorrow. Can we make 6mth libor at 0.98?"

87.     On that same date, ROBSON replied, "OK higher?...sure thing."

88.     On or about August 6 and August 7, 2008, Rabobank submitted a 6-month Yen

LIBOR rate of 1.00 percent, which was four basis points higher than August 5, 2008, moving

Rabobank's submission from the panel's second lowest to the upper half.

May 15, 2009

89.     On or about May 15, 2009, Trader-R asked ROBSON, who, at that time was

working at a brokerage firm, "How about 6m yen libor for today?"

90.     ROBSON responded, "well strange one...guys think the same 72..problem is UBS

wants a high one today so he will call his friends to get it higher if he can...but 72 it shud be

again"

91.     Trader-R wrote back, "i anyway want it to be hight so,, fine with me  cheers"

92.     ROBSON responded, "ok fair enough – will see what we can do for you mate !"

(Title 18, United States Code, Section 1349.)

## COUNT TWO
### (Wire Fraud)

93.    The allegations as set forth in paragraphs 1 through 19 and 21 through 92 are hereby realleged as if set forth herein.

94.    On or about June 15, 2007,  in the Southern District of New York and elsewhere, PAUL ROBSON and PAUL THOMPSON,  the defendants, together with Trader-R, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, having an effect on one or more financial institutions, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit,  in furtherance of the scheme to manipulate and attempt to manipulate the benchmark interest rates to which profitability of certain trades was tied, an international wire transfer communication was transmitted by wire from New York, New York via Tokyo, Japan to Utrecht, The Netherlands.

(Title 18, United States Code, Section 1343 and Title 18, United States Code, Section 2.)

## COUNT THREE
### (Wire Fraud)

95.    The allegations set forth in paragraphs 1 through 19 and 21 through 92 are realleged as if set forth herein.

96.    On or about March 28, 2008,  in the Southern District of New York and elsewhere, PAUL ROBSON, the defendant, together with Trader-R, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, having an effect on one or more financial institutions, and for obtaining money and property by

means of false and fraudulent pretenses, representations, and promises, would and did

transmit and cause to be transmitted by means of wire communication in interstate and

foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing

such scheme and artifice, to wit, in furtherance of the scheme to manipulate and attempt to

manipulate the benchmark interest rates to which profitability of certain trades was tied, an

international wire transfer communication was transmitted by wire from New York, New

York to Singapore.

(Title 18, United States Code, Section 1343 and Title 18, United States Code, Section 2.)

COUNT FOUR
(Wire Fraud)

97.     The allegations set forth in paragraphs 1 through 19 and 21 through 92 are

realleged as if set forth herein.

98.     On or about May 26, 2008,  in the Southern District of New York and

elsewhere, PAUL ROBSON,  the defendant, together with Trader-R, unlawfully, willfully,

and knowingly, having devised and intending to devise a scheme and artifice to defraud,

having an effect on one or more financial institutions, and for obtaining money and property

by means of false and fraudulent pretenses, representations, and promises, would and did

transmit and cause to be transmitted by means of wire communication in interstate and

foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing

such scheme and artifice, to wit, in furtherance of the scheme to manipulate and attempt to

manipulate the benchmark interest rates to which profitability of certain trades was tied, an

international wire transfer communication was transmitted  by wire from New York, New

York to Singapore.

(Title 18, United States Code, Section 1343 and Title 18, United States Code, Section 2.)

COUNT FIVE
(Wire Fraud)

99.    The allegations set forth in paragraphs 1 through 19 and 21 through 92 are realleged as if set forth herein.

100.   On or about September 25, 2008,  in the Southern District of New York and elsewhere, PAUL ROBSON and TETSUYA MOTOMURA,  the defendants, together with Trader-R, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, having an effect on one or more financial institutions, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, in furtherance of the scheme to manipulate and attempt to manipulate the benchmark interest rates to which profitability of certain trades was tied, an international wire transfer communication was transmitted  by wire from Utrecht, The Netherlands via Tokyo, Japan to New York, New York.

(Title 18, United States Code, Section 1343 and Title 18, United States Code, Section 2.)

## COUNTS SIX THROUGH FIFTEEN
(Wire Fraud)

101.    The allegations as set forth in paragraphs 1 through 19 and 21 through 92 are hereby realleged as if set forth herein.

102.    On or about the dates set forth in Column C below,  in the Southern District of New York and elsewhere,  the defendants set forth in Column B below, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, having an effect on one or more financial institutions, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, on or about the dates set forth below, among other dates, in furtherance of  the scheme to manipulate and attempt to manipulate the benchmark interest rates to which profitability of certain trades were tied, Thomson Reuters published a) the rates submitted by Rabobank and the other panel banks and b) the averaged rates – or LIBORs – by  wire from the United Kingdom to New York, New York, among other places.

| A | B | C |
|---|---|---|
| **Count** | **DEFENDANTS** | **DATE** |
| **SIX** | Robson Thompson | May 10, 2006 |
| **SEVEN** | Robson | July 27, 2006 |
| **EIGHT** | Robson | July 28, 2006 |
| **NINE** | Robson Thompson | November 9, 2006 |

| | | |
|---|---|---|
| **TEN** | Robson Thompson | December 13, 2006 |
| **ELEVEN** | Thompson | December 18, 2006 |
| **TWELVE** | Robson | September 21, 2007 |
| **THIRTEEN** | Robson Motomura | October 30, 2007 |
| **FOUREEN** | Robson Motomura | March 19, 2008 |
| **FIFTEEN** | Robson Motomura | July 24, 2008 |

(Title 18, United States Code, Section 1343 and Title 18, United States Code, Section 2.)

## FORFEITURE ALLEGATIONS
(18 U.S.C. §§ 982(a)(2)(A) and 981(a)(1)(C))

103.     The allegations contained in the General Allegations Section and in Counts 1

through 15 of this Indictment are realleged and incorporated by reference as though fully set

forth herein for the purpose of alleging forfeiture to the United States of America of certain

property in which one or more of PAUL THOMPSON, PAUL ROBSON, or TETSUYA

MOTOMURA has an interest.

104.     Upon conviction of any of the violations alleged in Counts 1 through 15 of this

Indictment, PAUL THOMPSON, PAUL ROBSON, and TETSUYA MOTOMURA shall forfeit

all of their right, title and interest to the United States of any property, constituting or derived

from proceeds obtained directly or indirectly as a result of the violation, pursuant to Title 18,

United States Code, Section 982(a)(2)(A).

105.     Upon conviction of any of the violations alleged in Counts 1 through 15 of this

Indictment, PAUL THOMPSON, PAUL ROBSON, and TETSUYA MOTOMURA shall forfeit

all of their right, title and interest to the United States of any property, constituting or derived from proceeds obtained directly or indirectly as a result of the violation, pursuant to Title 18, United States Code, Section 981(a)(1)(C).

106.    The property subject to forfeiture, pursuant to Forfeiture Allegations paragraphs 104 and 105 above, includes but is not limited to the sum of all proceeds the defendants derived from the offenses alleged in this indictment.

(All pursuant to Title 18, United States Code, Section 982(a)(2)(A); Title 18, United States Code, Section 981(a)(1)(C) and the procedures set forth at Title 21, United States Code, Section 853, made applicable by Title 28, United States Code, Section 2461.)

107.    If the property described above as being subject to forfeiture, as a result of any act or omission of the defendants,

> (1) cannot be located upon the exercise of due diligence,

> (2) has been transferred or sold to, or deposited with a third person,

> (3) has been placed beyond the jurisdiction of the Court,

> (4) has been substantially diminished in value, or

> (5) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p),

made applicable through Title 18, United States Code, Section 982(b) and the provisions of Title

28, United States Code, Section 2461(c), to seek forfeiture of any other property of the

defendants up to the value of the above forfeitable property.


Dated: 4/24/14                                    A TRUE BILL


                                                 _____
                                                 FOREPERSON


JEFFREY KNOX                                     JEFFREY D. MARTINO
Chief, Fraud Section                             Chief, New York Office
Criminal Division                                Antitrust Division
United States Department of Justice              United States Department of Justice


_____                 _____
BRIAN YOUNG                                      MICHAEL T. KOENIG
Trial Attorney                                   Trial Attorney
CAROL L. SIPPERLY                                Antitrust division
Senior Litigation Counsel                        United States Department of Justice
Criminal Division
United States Department of Justice


25