UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | S4:14-cr-00272-JSR |
| | : | |
| | : | |
| ANTHONY ALLEN, et al | : | |
| | : | |
| Defendants. | : | |
| | : | |

## MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS BASED ON *KASTIGAR*

RAYMOND HULSER
Chief, Public Integrity Section
D. BRITTAIN SHAW
Trial Attorney
CHARLES G. LA BELLA
Deputy Chief
Fraud Section
U.S. Department of Justice
Criminal Division
1400 New York Ave., NW
Washington, D.C. 20005
(202) 616-2162

## TABLE OF CONTENTS

INTRODUCTION ..........................................................................................................................1

BACKGROUND ..........................................................................................................................2

ARGUMENT .................................................................................................................................7

   I.    UNDER THE SAME-SOVEREIGN RULE, THE SELF-INCRIMINATION
        CLAUSE IS NOT IMPLICATED WHEN A FOREIGN SOVEREIGN
        COMPELS TESTIMONY ................................................................................................7

   II.   *KASTIGAR* APPLIES ONLY WHERE THE COMPELLING SOVEREIGN IS
        BOUND BY THE SELF-INCRIMINATION CLAUSE .............................................12

   III.  EVEN IF *KASTIGAR* APPLIES, THE RECORD OF THIS CASE SHOWS
        THAT THE PROSECUTION TEAM'S AND THE WITNESS'S LACK OF "TAINT"
        MAY BE ESTABLISHED WITHOUT A *KASTIGAR* HEARING..............................14

      A.  The defendants' argument that the government must prove that its decision
          to seek their indictment was independent of information provided by Paul
          Robson fails as a matter of law because *Kastigar* is not concerned with the
          exercise of prosecutorial discretion. ......................................................................14

      B.  Defendants fail to establish "a firm foundation resting on more than
          suspicion" that Mr. Robson was "tainted" by exposure to their FCA
          testimony. ...............................................................................................................16

      C.  Dismissal of the indictment is not the remedy..........................................................19

   IV.  THERE IS NO "FRUIT OF THE POISONOUS TREE." ...........................................20

CONCLUSION...........................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Bram v. United States*,
    168 U.S. 532 (1887) .......................................................................................... 21

*Brulay v. United States*,
    383 F.2d 345 (9th Cir. 1967) ........................................................................... 21

*Colorado v. Connelly*,
    479 U.S. 157 (1986) .......................................................................................... 21

*Feldman v. United States*,
    322 U.S. 487 (1944) ............................................................................................ 8

*Harrison v. United States*,
    392 U.S. 219, 222 (1968) ................................................................................. 22

*In re Terrorist Bombings of U.S. Embassies in East Africa*,
    552 F.3d 177, 200 (2d Cir. 2008) ................................................... 11, 20, 21, 22

Jose A. Cabranes, *Our Imperial Criminal Procedure: Problems in the Extraterritorial
    Application of U.S. Constitutional Law*, 118 YALE L.J. 1660, 1711 (June 2009) ........... 21

*Kastigar v. United States*,
    406 U.S. 441, 460 (1972) ............................................................................. 1, 12

*Knapp v. Schweitzer*,
    357 U.S. 371 (1958) ............................................................................................ 7

*Malloy v. Hogan*,
    378 U.S. 1 (1964) ................................................................................................ 8

*Murphy v. Waterfront Commission of New York Harbor*,
    378 U.S. 52, 79 (1964) .................................................................................. 8, 12

*Nix v. Williams*,
    467 U.S. 431, 443-44 (1984) ........................................................................... 22

*United States v. (Under Seal)*,
    794 F.2d 920, 926 (4th Cir. 1986) ................................................................... 14

*United States v. Ahmed*,
    No. 12 Cr. 661 (SLT), 2015 WL 1321612, *29-30 (E.D.N.Y. March 24, 2015) ........... 23

*United States v. Balsys*,
    524 U.S. 666 (1998) ............................................................... 1, 7, 8, 9, 10, 12

*United States v. Biaggi*,
    909 F.2d 662, 689 (2d Cir. 1990).......................................................................... 17

*United States v. Blau*,
    159 F.3d 68, 73 (2d Cir. 1998)........................................................................ 17, 18

*United States v. Brulay*,
    383 F.2d at 349 n.5 ............................................................................................. 21

*United States v. Byrd*,
    765 F.2d 1524, 1530 (11th Cir. 1985). .............................................................. 15

*United States v. Ceccolini*,
    435 U.S. 268, 276 (1978)............................................................................... 23, 24

*United States v. Fisher*,
    700 F.2d 780,784 (2d Cir. 1983).......................................................................... 22

*United States v. Gallo*,
    863 F.2d 185, 190 (2d Cir. 1988)................................................................... 18, 19

*United States v. Gregory*,
    611 F.Supp. 1033, 1042 (S.D.N.Y. 1985) ......................................................... 20

*United States v. Helmsley*,
    941 F.2d 71, 80 (2d Cir. 1991)............................................................... 17, 18, 20

*United States v. Kristel*,
    762 F. Supp. 1100 (S.D.N.Y. 1991).............................................................. 15, 16

*United States v. Kurzer*,
    534 U.S. F.2d 511 (2d Cir. 1976) ....................................................................... 18

*United States v. Leonardi*,
    623 F.2d 746, 752 (2d Cir. 1980).................................................................. 23, 24

*United States v. Lira*,
    515 F.2d 68, 71 (2d Cir. 1975)........................................................................... 14

*United States v. Mariani*,
    851 F.2d 595, 600 (2d Cir. 1988).................................................................. 15, 17

*United States v. Murdock*,
    284 U.S. 141 (1931)............................................................................................. 7

*United States v. Nagelberg*,
    434 F.2d 585 (2d Cir. 1970)................................................................................ 21

*United States v. Nanni,*
    59 F.3d 1425, 1431-32 (2d Cir. 1995) ................................................................ 16

*United States v. North,*
    910 F.2d 843, 862 (D.C. Cir. 1990) (*North I*) ................................................ 13

*United States v. North,*
    920 F.2d 940, 945 (D.C. Cir. 1990) (*North II*) ........................................ 13, 17

*United States v. Reyes,*
    157 F.3d 949, 954 (2d Cir. 1998) ...................................................................... 24

*United States v. Rivieccio,*
    919 F.2d 812, 815-16 (2d Cir. 1990) ......................................... 15, 17, 19, 24

*United States v. Schwimmer,*
    924 F.2d 443, 446 (2d Cir. 1991) ...................................................................... 15

*United States v. Slough,*
    641 F.3d 544, 553-54 (D.C. Cir. 2011) ...................................................... 15, 17

*United States v. Vilar,*
    729 F.3d 62, 73 (2d Cir. 2013) .......................................................................... 21

*United States v. Volpe,*
    42 F. Supp. 2d 204, 219 (E.D.N.Y. 1999) ...................................................... 20

*United States v. Welch,*
    455 F.2d 211 (2d Cir. 1972) ............................................................................... 21

*United States v. Wolf,*
    813 F.2d 970, 973 n.3 (9th Cir. 1987) ............................................................ 21

*United States v. Yousef,*
    327 F.3d 56 (2d Cir. 2003) .......................................................................... 20, 21

*Williams v. United States*, 401 U.S. 646, 662 (1971) ................................................ 22

## Statutes

18 U.S. C. § 6003(b)(1) ................................................................................................ 12

Defendants have filed a motion to dismiss the indictment asserting their Fifth Amendment privilege against self-incrimination (Dkt. 76).   Defendants' novel Fifth Amendment claim is based entirely on the fact that an independent regulatory authority in another country, the United Kingdom, obtained compelled statements from them in depositions in 2013.   There has been and will be no violation of the defendants' Fifth Amendment privilege in this case, and their motion should be denied.

The entirety of defendants' motion rests upon the unsupported and flawed legal premise that when a separate sovereign, in a lawful exercise of its own authority, compels a person's testimony in a foreign proceeding, the United States government is thereafter required, under *Kastigar v. United States*, 406 U.S. 441, 460 (1972), to prove that the evidence it proposes to use in a U.S. court is derived from sources wholly independent of that testimony.   No court has so held, and with good reason.   To the contrary, the Supreme Court has held that the same-sovereign rule applies to the compelling and use of testimony in the international context, and that the Self-Incrimination Clause applies only where the "compelling" and "using" sovereigns are both bound by the Clause.   *United States v. Balsys*, 524 U.S. 666 (1998).   That is clearly not the case here:  the compelling sovereign in this instance is the Financial Conduct Authority ("FCA"), a regulatory body in the United Kingdom.   To hold otherwise would provide foreign governments and agencies with undue, unwarranted, and dangerous control over the United States' ability to bring and sustain criminal charges in our own Federal courts.   That is not the law, and the Court need not look further to resolve defendants' motion.

Moreover, despite this clear Supreme Court authority, the United States has no intention of using the defendants' FCA depositions at trial, and it has made no use of them in this case.

Indeed, neither the prosecutors nor the law enforcement agents participating in the case have seen those depositions, and they were not presented to the grand jury.[1]

Finally, even if the Court were to find that the decisions and actions of a foreign regulatory authority could impose on the United States government the substantial burden associated with *Kastigar*, or the lesser burden of a fruit of the poisonous tree analysis, the government could meet that burden here.  As the indictment makes clear, the evidence in this case includes the defendants' own contemporaneous chat and email communications with their co-conspirators, which have been in the government's possession since 2010.  Only one government witness, Paul Robson, has seen the defendants' FCA depositions, and, as set forth below, his guilty plea and cooperation were neither motivated by nor influenced by the contents of the defendants' FCA depositions.   For their part, the defendants fail to identify any purported evidentiary use of their FCA depositions, and their blanket assertions of a but-for causal connection between their FCA depositions and the charges is plainly insufficient under well-established Second Circuit law.

The United States respectfully requests that the Court deny defendants' motion to dismiss in its entirety and without a hearing.

## **BACKGROUND**

The fourth superseding indictment in this case is the culmination of a multi-year investigation into manipulation of the London Interbank Offered Rate ("LIBOR") by several derivative swaps traders at Rabobank.  On October 29, 2013, Rabobank and the United States Department of Justice ("DOJ") entered into a Deferred Prosecution Agreement ("DPA") in

---

[1] Out of an abundance of caution, and pending a determination by the Court, the government has established a separate filter team led by the undersigned prosecutors to handle any issues stemming from the FCA depositions.

which the parties settled upon a 42-page stipulated Statement of Facts, which set forth how

Rabobank employees manipulated the Japanese Yen and U.S. Dollar LIBOR benchmarks.

(Rabobank Deferred Prosecution Agreement Statement of Facts, Exh. 1).  The Statement of Facts

relies heavily on contemporaneous email and chat communications provided voluntarily by

Rabobank between 2010 and 2012.  In particular, the Statement of Facts identifies numerous chat

and email messages in which defendants Anthony Allen (identified as "Submitter-3") and

Anthony Conti (identified as "Submitter-1") conspired to manipulate LIBOR to favor the bank's

derivative positions.  The Statement of Facts contains numerous incriminating conversations

involving Mr. Allen and Mr. Conti, including:

- Para. 17.  "On Wednesday, October 17, 2007, a U.S. Dollar swaps trader [Lee Stewart] emailed [Mr. Conti]: 'A nice low 1 month for the rest of the week please matey. Cheers.'"

- Para 19.  "On November 15, 2007 [Submitter-9] explained to [Mr. Conti]: 'The fixinh should be done by cash desk in agreement with deriv.  I do the fixing I ask swap desk what they have.'  [Mr. Conti] replied: '[Lee Stewart] has big fixing so we help him today . . . I am low because [Lee Stewart] has fixing. . I go higher tomorrow.'"

- Para. 21.  "On the morning of Monday, August 13, 2007, [Trader-2] messaged [Mr. Conti]: 'High 3s and 6s pls today mate (esp 6mths!!) if u would be so kind. . Gotta make money somehow.'  [Mr. Conti] messaged back 'cool.'"

- Para. 22.  "Trader-2 messaged [Mr. Conti]: 'where do u see 6m LIBOR tomorrow pls?' [Mr. Conti] wrote back: 'where do you like to see it, is more the question?'. . . Later that day, Trader-2 messaged [Mr. Conti] again, stating: 'gonna need a frickin high 6 mth fix tomorrow if ok with u. . . 5.42?'  [Mr. Conti] replied: 'send me an email matey for tomorrow . . my brain can't cope!!'  The next day [Trader-3] messaged [Mr. Allen], who served as Rabobank's Global Head of Liquidity and Finance and the head of Rabobank's money markets desk in London: 'any feeling for libors today?  specifically, 6mth.'  [Mr. Allen] wrote back: 'hi 1,2,3 month… 59, 56, 53.5 … 6 month 42, I think that's what Trader-2 needs.'  Trader-3 responded: 'it's actually me that needs it, but thanks.'  [Mr. Allen] replied: ahhh Trader-2, taking all the credit!!'"

- Para. 23.  "In addition to accommodating swaps trader requests, certain submitters also took their own trading positions into account at times.  For instance, on September 19, 2007, [Mr. Conti] told Submitter-9: 'today I have fixing so am low on the 3mth.'"

- Para. 28.  [O]n October 6, 2006, Trader-2 wrote to [Mr. Allen]: 'Hello Skipper, can u put 3s at 37 for me tomorrow pls. . . many thanks.'  [Mr. Allen] wrote back: 'Never in doubt!'"

- Para. 28.  "On November 29, 2006, Trader-2 again wrote to [Mr. Allen]: 'Hi mate, low 1s high 3s LIBOR pls!!! Don't tell Trader-1 ha haaaaaaa. Sold the market today dooooohhhh!'  [Mr. Allen] replied: 'ok mate, will do my best.'"

- Para. 28.  "On December 1, 2006, Trader-2 again wrote to [Mr. Allen]: 'Appreciate 3s go down, but a high 3s today would be nice … cheer chief.'  [Mr. Allen] wrote back: 'I am fast turning into your LIBOR bitch!!!!'"

- Para. 42.  "[Mr. Allen], who supervised the Yen LIBOR submitters in addition to the U.S. Dollar LIBOR submitters, was aware of the conduct on the desk he supervised and played an active role in it.  As an example, on March 14, 2007, Trader-4 messages [Mr. Allen] and asked: 'Is Submitter-5 in mate?'  [Mr. Allen] replied: 'Not yet, can I help?'  Trader-4 wrote back: 'No worries mate, I think Submitter-4 just wanted him to nudge up a few of the LIBORs.. Will send him a mail.'  [Mr. Allen] replied: 'OK cc [additional individual] and [Mr. Conti] on it aswell mate, just in case.'"

- Para. 52.  "Trader-5 likewise emailed [Mr. Allen], [Mr. Conti], and Submitter-5 on October 31, 2008, asking: 'If possible could you put 0.99% for 3m libor and 1.07% for 6m LIBOR pls?[2]

On April 28, 2014, the grand jury returned an indictment against three defendants, former Rabobank employees Paul Robson, Paul Thompson, and Tetsuya Motomura. (Dkt. 5). On June 10, 2014, Takayuki Yagami, a former Rabobank derivatives trader, pled guilty to one count of conspiracy pursuant to a cooperation agreement.  (Dkt. 12).  On August 18, 2014, Mr. Robson pled guilty to the first count of the indictment pursuant to a cooperation agreement. (Dkt. 19).  On October 16, 2014, the grand jury returned the Second Superseding Indictment, which was the first instrument to charge defendants Allen and Conti.  Whereas the first

---

[2] All of the documents cited here had been produced to the government prior to either defendants' FCA testimony or DOJ's interviews of Mr. Robson.  Indeed, all but one were produced between March and October 2012.

Indictment charged manipulation with respect to the Yen currency, the Second Superseding

Indictment expanded the scope of the allegations to include the U.S. Dollar currency.

 In the United Kingdom, the Financial Conduct Authority ("FCA") (formerly known as

the Financial Services Authority or "FSA") conducted its own separate regulatory investigation.

As part of discharging its regulatory mandate under U.K. law, the FCA took the testimony of Mr.

Conti in January of 2013 and the testimony of Mr. Allen in June of 2013. These interviews were

"compelled" under FCA authority; that is, they were required to answer questions and

admonished that under U.K. law, failure to respond could have legal consequences, including

contempt sanctions.  No U.S. prosecutor, law enforcement agent, or representative of any kind

was present for these interviews.  Nor were these interviews conducted at the request of the

United States.  Indeed, in late 2012, in the months leading up to the commencement of the

subject interviews in the U.K., DOJ attorneys, out of an abundance of caution, specifically and

repeatedly advised the FCA that it should not share with the DOJ or FBI any information learned

during such interviews.  (Sample Letter from DOJ to FCA, Exh. 2).   The FCA agreed not to do

so. (Sample FCA Response to DOJ, Exh. 3).   FBI Special Agent Jeffrey Weeks, the case agent,

was the only person to testify to the grand jury.  He has never viewed the transcripts of the

testimony that defendants Allen and Conti provided to the FCA and is not aware of the substance

of this testimony. (Declaration of Special Agent Jeffrey D. Weeks, Exh. 4).

 In March 2015, counsel for defendant Allen asked the government to provide him with

copies of FCA transcripts.  Government counsel indicated they did not have any of the FCA

materials.[3]  Out of an abundance of caution, the government established a filter team to handle

---

[3] Through their initial efforts to try to accommodate counsel's request, the government learned for the first time that Mr. Robson had been provided copies of FCA transcripts as part of the official FCA notice process.  The government also learned that Allen's counsel had already possessed the FCA transcripts he had asked the government to obtain for him.

any issues pertaining to the FCA transcripts. The filter team confirmed that the three prosecutors who presented the evidence to the grand jury in support of the Second Superseding Indictment— Carol Sipperly, Brian Young, and Michael Koenig—have never viewed the transcripts of the testimony that defendants Allen and Conti provided to the FCA and are not aware of the substance of this testimony.  Nor did their predecessors in the early months of the investigation—Alexander Berlin and Glenn Leon—ever view FCA transcripts or learn of their substance.  The same is true for the law enforcement agents involved in the case.  The filter team determined that only one government witness in this case, Mr. Paul Robson, had received and reviewed the defendants' FCA testimony and others, when he was provided a copy of his own FCA investigative report by his U.K. attorney.  (Declaration of Paul Robson, Exh. 5).  Filter counsel learned that as part of its official warning notice procedures, the FCA provides subjects with an investigative report and supporting materials, such as any transcripts of testimony cited in the report.

In May 2015, filter counsel disclosed to defense counsel which FCA transcripts Mr. Robson had received from the FCA (via his U.K. counsel), and advised that he received and reviewed them around November and December 2013 (Letter to Defense Counsel, May 26, 2015, Exh. 6).  Filter counsel further determined that no other government witness in this case had reviewed the defendants' FCA compelled testimony and disclosed this finding to defense counsel (Letter to Defense Counsel, June 29, 2015, Exh. 7).

## ARGUMENT

**I.    UNDER THE SAME-SOVEREIGN RULE, THE SELF-INCRIMINATION CLAUSE IS NOT IMPLICATED WHEN A FOREIGN SOVEREIGN COMPELS TESTIMONY.**

The FCA's action in compelling the defendants to testify in connection with its regulatory investigation in the U.K. does not implicate the Fifth Amendment's Self-Incrimination Clause.  As the Supreme Court held in *United States v. Balsys*, 524 U.S. 666 (1998), in rejecting a witness's invocation of the Fifth Amendment based on the fear that his testimony could be used against him in a foreign prosecution, the same-sovereign rule governs the compelling of testimony (and the use of such compelled testimony) in the international context.  That rule holds that the Self-Incrimination Clause applies only where the "compelling" and "using" sovereigns are both bound by the Clause.  The reasoning of *Balsys* leads directly to the conclusion that the decision of a foreign sovereign (to which the Self-Incrimination Clause does not apply) to compel a witness to give testimony that may incriminate him in the United States in no way inhibits the use or derivative use of that testimony in the United States.

Before the Supreme Court applied the doctrine of Fourteenth Amendment due process incorporation to the Self–Incrimination Clause, so as to bind the states, a state could compel a witness to give testimony that might incriminate him under federal law.  *Knapp v. Schweitzer*, 357 U.S. 371 (1958).  The converse was also true, in that the federal government could compel a witness to give testimony that might incriminate him under state law.  *United States v. Murdock*, 284 U.S. 141 (1931).  The principle established in these cases was that "full and complete immunity against prosecution by the government compelling the witness to answer is equivalent to the protection furnished by the rule against compulsory self-incrimination."  *Id.* at 149.  Under

this same-sovereign doctrine, testimony compelled by a state under a grant of immunity could be introduced into evidence in the federal courts. *Feldman v. United States*, 322 U.S. 487 (1944).

On the very same day that the Supreme Court ruled in *Malloy v. Hogan*, 378 U.S. 1 (1964) that the Self-Incrimination Clause applied to the states via the incorporation doctrine, the Court overruled these earlier precedents and held that when a state compels a witness to give incriminating testimony under a grant of immunity, the federal government is "prohibited from making any [] use of [the] compelled testimony and its fruits," *Murphy v. Waterfront Commission of New York Harbor*, 378 U.S. 52, 79 (1964).

In *United States v. Balsys*, 524 U.S. 666, the Supreme Court explained that the decision in *Malloy* had required a reconsideration of the *Murdock/Knapp* same-sovereign rule, *id.* at 681. This was so because "the Fifth Amendment limitation could no longer be seen as framed for one jurisdiction alone, each jurisdiction having instead become subject to the same claim of privilege flowing from the one limitation." *Id.* As the Court explained, after *Malloy*, "fear of prosecution in the one jurisdiction bound by the Clause now implicated the very privilege binding upon the other." *Id.*[4]

Having thus elucidated the rationale for the ruling in *Murphy*, the Court considered *Kastigar* and the government's authority to "exchange the stated privilege for an immunity to prosecutorial use of any compelled inculpatory testimony." *Id.* at 682. In doing so, the Court stated that after *Malloy* made the privilege binding upon the states, it would "have been

---

[4] Significantly, the Court rejected what it referred as to the "competing rationale in *Murphy*" justifying the holding that testimony compelled by a state government could not be used in a federal case, namely, a rationale based on "personal privacy." *Balsys*, 524 U.S. at 683-84. After showing *Murphy*'s discussion of the English common-law evidentiary privilege against compelled self-incrimination to have been "fatally flawed," the Court stated that "to the extent that the *Murphy* majority went beyond its response to *Malloy* and undercut *Murdock*'s rationale on historical grounds, its reasoning cannot be accepted now." *Id.* at 688.

intolerable to allow a prosecutor in one or the other jurisdiction to eliminate the privilege by offering immunity less complete than the privilege's dual jurisdictional reach." *Id.*

The *Balsys* Court then went on to recognize the continued force of the same-sovereign rule of *Murdock/Knapp*. The Court in *Balsys* concluded that "*Murphy* rests upon the same understanding of the Self–Incrimination Clause that *Murdock* recognized" in that both are based on "the principle that the courts of a government from which a witness may reasonably fear prosecution may not in fairness compel the witness to furnish testimonial evidence that may be used to prove his guilt." *Id.* at 682-83. As explained in *Balsys*, "[a]fter *Murphy*, the immunity option open to the Executive Branch could be exercised only on the understanding that the state and federal jurisdictions were as one, with a federally mandated exclusionary rule filling the space between the limits of state immunity statutes and the scope of the privilege." *Id.* at 683. In holding that the federal government could compel a witness to give testimony that might incriminate him in a criminal prosecution by a foreign government, the Court thus "rel[ied] on the force of our precedent, notably *Murdock*, as confirming this same-sovereign principle, as adapted to reflect the post-*Malloy* requirement of immunity effective against both sovereigns subject to the one privilege under the National Constitution." *Id.* at 689.

The Court found this same-sovereign principle (*i.e.*, the notion that the state and federal governments were the same sovereign insofar as the Self-Incrimination Clause applied to both) to underlie *Murphy*'s discussion of "cooperative federalism" (*i.e.*, coordinated state and federal efforts to combat criminal activity), which had figured prominently in the *Murphy* Court's decision. *Id.* at 694 ("For the *Murphy* majority, 'cooperative federalism' was not important standing alone, but simply because it underscored the significance of the Court's holding that after *Malloy* it would be unjustifiably formalistic for a federal court to ignore fear of state

prosecution when ruling on a privilege claim.").  In doing so, the Court rejected an appeal to "cooperative internationalism" (*i.e.*, international cooperation in criminal enforcement) as a reason for finding that the Self-Incrimination Clause barred the federal government from compelling a witness to give testimony that could incriminate him in a foreign prosecution.  *Id.* The Court found that because there was "no analog of *Malloy*, imposing the Fifth Amendment beyond the National Government, there [wa]s no premise in *Murphy* for appealing to 'cooperative internationalism' by analogy to 'cooperative federalism.'"  *Id.* at 695.  The Court thus pointed back to the "pre-*Murphy* era when the States were not bound by the privilege" and when "testimony compelled in a federal proceeding was admissible in a state prosecution."  *Id.*

The import of *Balsys* in this case is clear:  the same-sovereign rule of *Murdock*/*Knapp*— that the Fifth Amendment privilege applies only where the sovereign compelling the testimony and the sovereign using the testimony are both restrained by the Fifth Amendment from compelling self-incrimination—continues to have force when the sovereigns at issue are the United States and a foreign country.  *Balsys* was the international counterpart to *Murdock*, in holding that the federal government can compel a witness to give testimony that might incriminate him in a foreign proceeding.  But its reasoning (which was not based on the simpler point that the primary purpose of the Self-Incrimination Clause is to protect defendants on trial in American courts) equally supports the application of *Knapp* in the international context, *i.e.*, that the privilege is not implicated where a foreign government compels a witness to give testimony that may incriminate him in the United States.  In adopting the same-sovereign rule where the United States is the compelling sovereign, the Supreme Court necessarily endorsed that rule in cases where the United States is the using party.

By contrast, holding that the Clause (and the *Kastigar* analysis) is implicated by a foreign court's compulsion of testimony would make it extraordinarily difficult for law enforcement officials in separate countries to perform their lawful functions. *See In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 177, 208 (2d Cir. 2008) ("*Embassy Bombings*"), (noting that "[f]or better or worse, we live in a world of nation-states in which our Government must be able to 'function effectively in the company of sovereign nations'")(internal citations omitted). Indeed, such a holding could empower uncooperative nations to affirmatively scuttle prosecutions in the United States.  If a foreign regulator compelled testimony during the course of its investigation, the publication of its results may well include information obtained during the compelled interviews.  If *Kastigar* applied in these circumstances, the United States would face grave difficulties in seeking to establish that all of its evidence was wholly independent of the public findings.  Such a rule would impede the ability of U.S. and foreign officials each to perform their functions absent a degree of coordination that simply does not exist in the international context.

Worse yet, a hostile government bent on frustrating prosecution of a defendant in the United States need do no more than compel the witness to testify and publicize the substance of his testimony.  In doing so, that government would unilaterally put the United States to the heavy *Kastigar* burden.  Suffice it to say that it is not for a foreign sovereign to determine when to place such obstacles in the way of a U.S. prosecution.

Although the government would be permitted to use the defendants' testimony under the same-sovereign rule, it is not seeking to do so here.  Indeed, as set forth above, the prosecution

team has not been exposed to the FCA-compelled testimony; only a single witness has been exposed, as part of the FCA's regular process.[5]

## II.    *KASTIGAR* APPLIES ONLY WHERE THE COMPELLING SOVEREIGN IS BOUND BY THE SELF-INCRIMINATION CLAUSE.

Because a foreign sovereign has no authority to strike a bargain that would burden the United States or any state government, *Kastigar*'s "independent source" doctrine, a means of holding the government to its deal, has no application in these circumstances.  The *Kastigar* decision focused narrowly on the constitutionality of a federal statute that prohibits the use and derivative use of testimony compelled thereunder.  *Kastigar*, 406 U.S. at 460.  Specifically, in addressing a statute that permits the Justice Department to compel testimony only when it concludes that the information is "necessary to the public interest," 18 U.S. C. § 6003(b)(1), the Court conceived its "independent source" framework to address situations in which the U.S. government decided to trade the benefits of immunized testimony for the resulting impediments to criminal prosecution.  *Kastigar* thus reflects the Court's judgment of how best to weigh the "important [compulsion] powers of the *States as well as the Federal Government*" against the Fifth Amendment rights of individual defendants.  *See Kastigar*, 406 U.S. at 460 (emphasis added) (quoting *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 93-94 (1964) (abrogated by *United States v. Balsys*, 524 U.S. 666 (1998)).

To that end, the identity of the actor that compelled the testimony in question is critical to the application of *Kastigar*'s "independent source" test, which establishes a check on the

---

[5] The *Balsys* Court itself recognized a potential limitation on the rule it endorsed, in circumstances where one country was "granting immunity from domestic prosecution *for the purpose of obtaining evidence to be delivered to other nations* as prosecutors of a crime common to both countries."  *Balsys*, 524 U.S. at 699 (emphasis added).  In such a case, the Court noted, the two countries might be perceived to be acting as a single sovereign and thus be subject to the Self-Incrimination Clause.  That did not happen here.

immunity powers of the Federal Government and the States who are subject to the constraints of the Fifth Amendment and U.S. laws.   The decisions interpreting *Kastigar* make clear that the case's stringent requirement that the government prove that all of its evidence is independent of compelled testimony is the byproduct of a bargain in which a federal or state actor obtains testimony in exchange for, and with full knowledge of, the obstacles to prosecution that are necessary to protect the witness's Fifth Amendment rights.   *See Balsys*, 524 U.S. at 682 (describing compulsion and immunization as a transaction "under the Self-Incrimination Clause, where the government has an option to exchange the stated privilege for an immunity to prosecutorial use of any compelled inculpatory testimony"); *see also United States v. North*, 910 F.2d 843, 862 (D.C. Cir. 1990) (*North I*) (observing that "the Fifth Amendment requires that the government establish priorities before making the immunization decision" and "decide which it values more: immunization (perhaps to discharge institutional duties, such as congressional fact-finding and information-dissemination) or prosecution");  *United States v. North*, 920 F.2d 940, 945 (D.C. Cir. 1990) (*North II*) ("Surely Congress [confers immunity] only when its perception of the national interest justifies this extraordinary step. . . The decision as to whether the national interest justifies that institutional cost in the enforcement of the criminal laws is, of course, a political one to be made by Congress.") .

The FCA's compulsion of the defendants' testimony was a valid exercise of its regulatory powers under the laws of a separate sovereign, the United Kingdom. The United States did not request, participate in, or seek to learn the substance of the FCA's interviews of the defendants. Nor did the FCA make any representations to the defendants about their rights or immunity under U.S. law.  More important, as a foreign regulator, the FCA has no role in our system of cooperative federalism and no responsibility for enforcing U.S. law.  As such, the FCA cannot

exchange use immunity for a waiver of the Fifth Amendment privilege, and its actions cannot impose the *Kastigar* burden upon prosecutors in the United States. A conclusion that a foreign securities regulator could do so would extend *Kastigar* into risky territory. *See United States v. (Under Seal)*, 794 F.2d 920, 926 (4th Cir. 1986) (stating that "our own national sovereignty would be compromised if our system of criminal justice were made to depend on the actions of a foreign government beyond our control"). *Accord United States v. Lira*, 515 F.2d 68, 71 (2d Cir. 1975) (noting that U.S. law enforcement is not required to "monitor the conduct of representatives of each foreign government" to assure that they comply with American constitutional standards). We note that the FCA representatives in the U.K. are particularly ill-suited to determine whether the need to compel testimony outweighs the impediments imposed by *Kastigar* because criminal prosecutors in the U.K. are permitted to make derivative use of compelled testimony.[6]

### III.   EVEN IF *KASTIGAR* APPLIES, THE RECORD OF THIS CASE SHOWS THAT THE PROSECUTION TEAM'S AND THE WITNESS'S LACK OF "TAINT" MAY BE ESTABLISHED WITHOUT A *KASTIGAR* HEARING.

**A. The defendants' argument that the government must prove that its decision to seek their indictment was independent of information provided by Paul Robson fails as a matter of law because *Kastigar* is not concerned with the exercise of prosecutorial discretion.**

The defendants make a blanket challenge to the government's prosecutorial decisions based solely on the fact that Mr. Robson reviewed their compelled testimony. Their claim fails

---

[6] For example, in *R v. Hertfordshire County Council Ex Parte Green Environmental Industries Ltd. and Another* [2000] UKHL 11 [2000] 2 AC 412 (appeal taken from Eng.), the House of Lords rejected the appeal of a defendant who claimed that his self-incrimination rights were violated when he was compelled to give testimony to a local waste regulation authority, noting that that the compelled testimony "[n]o doubt could have been used to assist the Council in gathering evidence for a prosecution against the appellants." *Available at http://www.publications.parliament.uk/pa/ld199900/ldjudgmt/jd000217/hert-1.htm.* (Exh. 8).

14

as a matter of law.  The Second Circuit has rejected the argument that the Fifth Amendment is violated if immunized testimony has "tangentially influenced the prosecutor's thought processes in preparing the indictment and preparing for trial."  *United States v. Mariani*, 851 F.2d 595, 600 (2d Cir. 1988).  "[N]on-evidentiary uses" of immunized testimony, such as confirming other evidence or forming judgments about how to prepare for trial, are not prohibited.  *Id.* at 600-01; *see also United States v. Rivieccio*, 919 F.2d 812, 815-16 (2d Cir. 1990) (to extent immunized testimony influenced prosecutor's thought process or questioning of witness, or enabled him to predict that defendant would not testify, such use was merely tangential and not prohibited); *United States v. Schwimmer*, 924 F.2d 443, 446 (2d Cir. 1991) (use of information obtained pursuant to immunity order to confirm information government already had not prohibited).  Applying this "non-evidentiary use" doctrine, at least two other Courts of Appeals have held that the decision to seek an indictment is not vulnerable as linked to immunized testimony.  *United States v. Slough*, 641 F.3d 544, 553-54 (D.C. Cir. 2011); *United States v. Byrd*, 765 F.2d 1524, 1530 (11th Cir. 1985).  Thus, insofar as the defendants contend that *Kastigar* reaches the prosecutors' thought processes, they are mistaken.

The defendants' heavy and misplaced reliance on *United States v. Kristel*, 762 F. Supp. 1100 (S.D.N.Y. 1991), neither advances their cause nor undermines this analysis, as the facts of that case demonstrate.  The defendant in *Kristel* received immunity from the U.S. Attorney in the Eastern District of New York in exchange for testimony about his participation in a conspiracy in which he pretended to be the victim of commercial extortion.  *Id*. at 1107.  Meanwhile, Kristel's name surfaced in an investigation being conducted in the Southern District of New York into a similar scam.  The prosecutors in the Southern District viewed Kristel as a victim of the scam they were investigating until the agents learned from the investigators who had handled Kristel's

case in the Eastern District that Kristel's *modus operandi* was to facilitate the movement of bribe payments by pretending to be a victim of commercial extortion. *Id*. at 1103. The Southern District prosecutors thus changed their view of Kristel's culpability, obtained the Eastern District's files, and interviewed and subsequently indicted Kristel. Thereafter, the district court, applying *Kastigar*, dismissed the indictment. In doing so, the court distinguished *Rivieccio* on the ground that the Southern District prosecutors had no knowledge of Kristel's participation in criminal activity from an untainted source before obtaining the Eastern District information and that Kristel's immunized testimony had more than a tangential influence on the prosecution in that it led the agent to focus on Kristel and gather evidence against him. *Id.* at 1107-08. This case bears no resemblance to *Kristel*. Here, unlike in that case, the government had amassed extensive evidence of the defendants' involvement in LIBOR manipulation long before it ever spoke to Mr. Robson. *Kristel* is therefore inapposite.

**B. Defendants fail to establish "a firm foundation resting on more than suspicion" that Mr. Robson was "tainted" by exposure to their FCA testimony.**

Under *Kastigar*, "[o]nce the defendant shows that, under a grant of immunity, he has testified to matters related to the prosecution," the government must prove by a preponderance of the evidence that "the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *United States v. Nanni*, 59 F.3d 1425, 1431-32 (2d Cir. 1995) (citation and internal quotation marks omitted). "While the strongest proof that the information came from an independent source would be evidence that the government was in possession of independent leads or evidence prior to the giving of the immunized testimony," evidence obtained after exposure to the taint "can suffice to support a finding that the information was derived from independent sources." *Id.* at 1432 (citations omitted).

To warrant a *Kastigar* hearing, "the defendant bears the burden of laying 'a firm foundation resting on more than suspicion' that proffered evidence was tainted by exposure to immunized testimony." *Slough,* 641 F.3d at 551 (quoting *North II*, 920 F.2d at 949 n.9)). Simply "hypothesizing a direct 'chain of taint' from [their] immunized testimony" is an insufficient showing to warrant a hearing under *Kastigar* or a finding a Fifth Amendment violation has occurred. *See United States v. Helmsley*, 941 F.2d 71, 80 (2d Cir. 1991). Where the Fifth Amendment does come into play, however, is "where the immunized testimony has some *evidentiary* effect in a prosecution against the witness." *Id.* at 82 (emphasis added). The Second Circuit has emphasized that the primary focus of *Kastigar*'s prohibition on direct or indirect use of immunized testimony is on evidentiary use. *Id.*; *see also Rivieccio,* 919 F.2d at 815 ("To the extent the Government's thought process or questioning of witnesses may have been influenced by [defendant's] immunized testimony, we hold that any such use was merely tangential and was therefore not a prohibited use."); *Mariani,* 851 F.2d at 600 (rejecting other circuits' holdings that a witness whose immunized testimony may have tangentially influenced the prosecutor's process of preparing to indict or try a criminal case against him was entitled to a blanket exemption from prosecution).

When a defendant claims that a witness was motivated to come forward with evidence against a defendant because of that defendant's immunized testimony, the court must determine whether "the witness would have provided adverse testimony entirely apart from the motivating effect of the immunized testimony." *United States v. Biaggi*, 909 F.2d 662, 689 (2d Cir. 1990). For example, where the court finds that a witness chose to cooperate against an immunized witness solely to be released from prison and not to retaliate against the defendant, the *Kastigar* challenge should be denied. *United States v. Blau*, 159 F.3d 68, 73 (2d Cir. 1998). Where the

compelled testimony itself is not used directly, such as in cases like this one involving a witness's exposure to the testimony, the court may properly consider whether the testimony was of any value. *See, e.g.*, *United States v. Gallo*, 863 F.2d 185, 190 (2d Cir. 1988) (claim of improper use untenable because immunized testimony "consisted mostly of denials and ambiguous answers").

Here, defendants' blanket assertion—without more—that witness Paul Robson is necessarily "tainted" because he reviewed transcripts of their FCA testimony is insufficient to merit a *Kastigar* hearing. Such conclusory allegations of "but for" causation are insufficient. The Second Circuit has declined to extend *Kastigar* to cases where a defendant cannot identify an evidentiary use or effect of the compelled testimony, and the defendant has failed to do so here. *See Helmsley*, 941 F.2d at 80-81 (assertion of a "cause in fact" relationship between immunized testimony and a subsequent conviction, without more, expands the right against self-incrimination "far beyond any discernible policy served by the right"). And, while the Second Circuit in *United States v. Kurzer*, 534 U.S. F.2d 511 (2d Cir. 1976), and subsequent cases recognized that a cooperating witness's testimony should be barred where the cooperator was motivated to testify based on the defendant's compelled testimony, here, the defendants admit they have no knowledge whatsoever of Mr. Robson's motivation for testifying. (Def. Mot. at 15, n. 6). Mr. Robson was not motivated in any way to plead guilty or testify based on having reviewed the defendants' FCA transcripts, but rather his decision was a direct response and result of his indictment by the United States. (Exh. 5). Accordingly, the defendants' skeletal "but-for" causation assertions are insufficient to establish a viable *Kastigar* claim. *See Blau*, 159 F.3d at 73 (denying *Kastigar* claim where witness's reasons for cooperating were unrelated to defendant's immunized testimony). Mr. Robson, who worked next to the defendants for years,

learned no new facts from his review of the defendants' transcripts nor was his recollection of events refreshed in any way.[7]  Mr. Robson recalls that he did not agree with or believe parts of their testimony, but his review of the defendants' FCA statements did not create any animus on his part towards the defendants that motivated him to testify.  *See Gallo*, 863 F.2d at 190 (noting that defendant's testimony "consisted mostly of denials and ambiguous answers" and provided "nothing to use" for purposes of *Kastigar*).  Robson did not need an FCA transcript to remind him of what he participated in and witnessed first-hand – he worked with the defendants in the same office for years, and his version of events is corroborated by the defendants' own contemporaneous communications and the testimony of other witnesses.  In sum, Mr. Robson's decision to accept responsibility for his conduct and cooperate in this matter is wholly independent of his review of the defendants' FCA transcripts.

### C.   Dismissal of the indictment is not the remedy.

Defendants offer no basis to conclude that the government used immunized testimony in this case, but even if they had, the remedy would not be dismissal of the indictment.  "[T]he legislative history of 18 U.S.C. §§ 6002 and 6003 shows that Congress did not intend that a violation of those sections would result in a *per se* constitutional injury requiring dismissal of the indictment."  *Rivieccio*, 919 F.2d at 816 (citation and internal quotation marks omitted).  Instead, even if there were a direct violation of 18 U.S.C. § 6002 itself, "generally the remedy for the violation is the suppression of the tainted evidence at trial, not a dismissal of the indictment."  *Rivieccio*, 919 F.2d at 816.[8]  Defendants offer nothing but speculation and blanket assertions of

---

[7] Should the Court determine that review of the FCA transcripts is necessary, filter counsel, to the extent permissible under law, will make them available to the Court *in camera*.

[8] The Second Circuit has identified two narrow exceptions to this rule, neither of which is applicable here.  The first is "when the defendant testifies under immunity before the same grand jury returning the indictment or when the immunized testimony is placed before the indicting grand jury."  *Id.* at 816 n.4.  Here, neither defendant's compelled testimony was presented to the

taint in this case, and there is no basis to conclude that any evidence is, in fact, the result of their compelled statements.

Finally, even if the Court were to conclude that *Kastigar* applies, it may deny the defendants' motion without holding a full evidentiary hearing. *See, e.g., Helmsley*, 941 F.2d at 80 (district court acted within its discretion in denying defendant's *Kastigar* motion based on its review of affidavits and transcripts but without holding a full evidentiary hearing). In the event that the Court concludes that an evidentiary hearing is necessary, such a hearing should be held after trial. It is "the general practice in this circuit to defer [a *Kastigar*] hearing until after trial," an approach that allows the court to "evaluate whether the government's evidence was from independent sources, and avoid disclosure of the government's proof before trial." *United States v. Volpe*, 42 F. Supp. 2d 204, 219 (E.D.N.Y. 1999). Indeed, a trial will likely obviate the need for a *Kastigar* hearing, because the government's presentation will make clear that its evidence in no way relies upon defendants. Allen's and Conti's compelled statements. *See United States v. Gregory*, 611 F.Supp. 1033, 1042 (S.D.N.Y. 1985) (resolution of defendant's *Kastigar* motion taken up after trial because the government's proof at trial may obviate the need for a hearing).

## IV.    THERE IS NO "FRUIT OF THE POISONOUS TREE."

The Second Circuit's decision in *United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003), broadly states that "statements taken by foreign police in the absence of *Miranda* warnings are admissible if voluntary." *Id.* at 145. By implication, this language suggests that involuntary statements taken by foreign police would not be admissible in U.S. courts, but the court did not so hold. The Court repeated this broad statement in *Embassy Bombings*, 552 F.3d at 200, citing

---

grand jury. The second is "when the government concedes that the indictment rests almost exclusively on tainted evidence." *Id.* That is clearly not the case here. To the contrary, as the Statement of Facts and the indictment itself make clear, the government's case is based largely on electronic communications in which the defendants conspired to manipulate LIBOR.

*Yousef.* "However broadly worded, these statements [by the Court] must be understood in their context." *United States v. Vilar*, 729 F.3d 62, 73 (2d Cir. 2013); *see generally* Jose A. Cabranes, *Our Imperial Criminal Procedure: Problems in the Extraterritorial Application of U.S. Constitutional Law*, 118 YALE L.J. 1660, 1711 (June 2009) (highlighting the Court's "pragmatic, context-specific approach" to determining whether a Constitutional protection or limitation applies beyond the borders of the United States). In *Yousef*, the question was whether concededly voluntary statements taken by foreign police in the absence of *Miranda* warnings were admissible. *United States v. Yousef*, 327 F.3d at 144-45. And in *Embassy Bombings*, the issue involved the admissibility of statements made to U.S. agents by foreign nationals held in foreign custody. *Embassy Bombings*, 552 F.3d at 198. Neither case addressed the admissibility of potentially involuntary statements taken by foreign officials. And neither case addressed the issue presented here, namely, the ability of a foreign government to impose *Kastigar* burdens upon the United States in its own courts.[9]

---

[9] Moreover, the broad statement in *Yousef*, repeated in *Embassy Bombings*, was based on pre-*Balsys* cases that, accordingly, did not address the holding of *Balsys*. Indeed, of the cases cited in *Yousef* in support of this proposition, only *United States v. Welch*, 455 F.2d 211 (2d Cir. 1972), and *United States v. Nagelberg*, 434 F.2d 585 (2d Cir. 1970), provide a rationale for it. *Welch* relies upon *Bram v. United States*, 168 U.S. 532 (1887) (applying Fifth Amendment standards in assessing admissibility of statements taken by Canadian officials), for the proposition that a court "must exclude" an involuntary statement "because of its inherent unreliability." *United States v. Welch*, 455 F.2d at 213. There is no such concern here, as the government is not seeking to admit the defendants' FCA testimony. And *Nagelberg* relies on *Brulay v. United States*, 383 F.2d 345 (9th Cir. 1967), which, in turn, interpreted *Bram* as focusing on the admission of an involuntary statement in evidence in a United States court as the critical factor implicating the Fifth Amendment. *United States v. Nagelberg*, 434 F.2d at 587 n.1; *United States v. Brulay*, 383 F.2d at 349 n.5. But the Ninth Circuit has cast doubt upon *Brulay*'s (and, by extension, *Bram*'s) continuing vitality, in light of *Colorado v. Connelly*, 479 U.S. 157 (1986). *United States v. Wolf*, 813 F.2d 970, 973 n.3 (9th Cir. 1987). In that case, the Supreme Court held that the introduction of evidence into a judicial proceeding does not by itself satisfy the "state action" requirement for triggering the constitutional protection against involuntary confessions. *Colorado v. Connelly*, 479 U.S. at 165-66. Thus, the broad statements in *Yousef* and *Embassy Bombings* should be evaluated not only in light of the specific factual contexts of those cases, but also against the Supreme Court's holdings in *Balsys* and *Connelly*.

If the Court were to adopt the approach applicable to involuntary statements, it would not call for an application of *Kastigar*, but rather, the application of the exclusionary rule, requiring a "fruits" analysis in assessing the admissibility of evidence linked to such statements.  *See Williams v. United States*, 401 U.S. 646, 662 (1971) ("When coercion, impermissible under the Fifth Amendment, has actually produced an involuntary statement, we have invariably held that the fruits of that unconstitutional coercion may not be used to prosecute the individual involved for crime."); *see also Harrison v. United States*, 392 U.S. 219, 222 (1968); *United States v. Fisher*, 700 F.2d 780,784 (2d Cir. 1983).  It is not at all obvious that the exclusionary rule should apply here, as the primary purpose of excluding such fruits is to deter police misconduct.  There was no misconduct here, as the FCA was acting in accordance with its lawful powers in compelling the defendants' testimony.  Moreover, the Second Circuit has recognized that exclusionary rules have "little, if any, deterrent effect" on the conduct of foreign officials.  *Embassy Bombings*, 552 F.3d at 202.  Nonetheless, the Supreme Court has recognized the "functional similarity" between the independent source and inevitable discovery doctrines, as both ensure that the government is "in the same, not a worse, position that they would have been in" absent the challenged conduct.  *Nix v. Williams*, 467 U.S. 431, 443-44 (1984).  Accordingly, assuming the Fifth Amendment is implicated at all here, in the Fifth Amendment context, the Second Circuit has recognized "three commonly advanced exceptions to the exclusionary rule— the independent source, inevitable discovery, [and] attenuation doctrines."  *Fisher*, 700 F.2d at 784 (citation and internal quotation marks omitted).  These doctrines provide an appropriate mechanism for protecting the defendants from having their compelled testimony used against

---

them while at the same time ensuring that the government is not worse off than it would have been had the FCA not compelled the defendants' testimony.

Prior to conducting any attenuation or "fruits" analysis, however, courts require that a defendant's motion be "sufficiently particularized to trigger the need for such a hearing." *United States v. Ahmed*, No. 12 Cr. 661 (SLT), 2015 WL 1321612, *29-30 (E.D.N.Y. March 24, 2015) (finding that "in order to trigger the need for a *pre-trial* taint hearing, Defendants must do more than merely speculate that all of the Government's evidence *may* be tainted"). Here, defendants' assertions of taint are conclusory and fail to set forth necessary links connecting Mr. Robson's cooperation and his exposure almost two years ago to the defendants' FCA testimony. Indeed, there are none.

The Supreme Court has recognized that a live witness's testimony is different from physical evidence in that "[w]itnesses can, and often do, come forward and offer evidence entirely of their own volition." *United States v. Ceccolini*, 435 U.S. 268, 276 (1978). As such, the Court has remarked that "the degree of free will necessary to dissipate the taint will very likely be found more often in the case of live-witness testimony than other kinds of evidence." *Id.* at 276-77. Notably, the Court has expressed concerns about "[r]ules which disqualify knowledgeable witnesses from testifying at trial" as "serious obstructions to the ascertainment of truth." *Id.* (citation and internal quotation marks omitted). In applying a fruits analysis to witness testimony, courts consider the following factors: (a) "the stated willingness of the witness to testify," (b) "the role played by the illegally seized evidence in gaining his cooperation," (c) "the proximity between the illegal behavior, the decision to cooperate and the actual testimony at trial," and (d) "the [motivation of the police] in [obtaining the evidence]." *United States v. Leonardi*, 623 F.2d 746, 752 (2d Cir. 1980).

Under these factors, there is no basis for exclusion of Mr. Robson's testimony.   Mr. Robson's decision to plead guilty and testify for the United States in this matter was a product of his own free will and "detached reflection."  *Leonardi*, 623 F.3d at 753; *United States v. Reyes*, 157 F.3d 949, 954 (2d Cir. 1998); (Exh. 5).  Moreover, Mr. Robson was in no way motivated to cooperate or testify by having reviewed his FCA investigative report or the defendants' FCA testimony or by any animus toward the defendants. (*Id.*).  To the contrary, Mr. Robson made the decision to plead guilty and cooperate with the United States based upon his indictment in the United States in January 2014. (*Id.*).  Neither the FCA investigation nor his review of any transcripts of FCA testimony played any role whatsoever in his decision to plead guilty and cooperate in the U.S. matter.  (*Id.*).  The considerable lapse of time between the alleged "poisonous" conduct and Mr. Robson's decision to plead guilty and cooperate—nine months— also strongly supports the admission of his testimony.  *See Ceccolini*, 435 U.S. at 272 (finding attenuation where gap was four months); *Leonardi*, 623 F.2d at 752-53 (finding attenuation where gap between illegal act and decision to cooperate was one month); *Reyes*, 157 F.3d at 955 (sufficient attenuation found where two-and-a-half months elapsed).  Lastly, the FCA's motivation in compelling the defendants' testimony was to investigate misconduct in the U.K. financial markets, which was a lawful exercise of their regulatory powers; exclusion would not have any deterrent effect on their future conduct.

With these principles in mind, Mr. Robson's testimony is clearly attenuated from the FCA's actions.  As discussed above, the DOJ had been investigating defendants Allen and Conti for over a year by the time Mr. Robson first met with the DOJ on July 17, 2014.  *Rivieccio*, 919 F.2d at 815 (affirming district court's finding that witness's trial testimony was derived from independent legitimate source where government was aware of witness and his role prior to

being identified in appellant's grand jury testimony).  By that time, Mr. Robson was well known to the government by virtue of the evidence it had collected in its long-running investigation of LIBOR manipulation that resulted in the DPA with Rabobank nine months earlier.  (Exh. 1).

Given that the government was well aware of Mr. Robson through its investigation of LIBOR manipulation at Rabobank and had amassed substantial evidence of Mr. Robson's guilt (as well as the guilt of defendants Allen and Conti) through that investigation, there is no potential taint involving the identification of Mr. Robson as a witness.  Because the defendants' compelled testimony played no role in motivating Mr. Robson to testify in this case, there is similarly no taint to be dissipated as to his willingness to testify.  Nor is there any suggestion that anything in the defendants' testimony has affected the substance of Mr. Robson's testimony in any way.  Thus, even applying a fruits analysis, the defendants' claim should be rejected.

## CONCLUSION

Accordingly, based on the foregoing, this Court should deny defendants' motion to dismiss the superseding indictment in its entirety and without a hearing.

RAYMOND HULSER
Chief, Public Integrity Section


_____/s/ Brittain Shaw_____

D. BRITTAIN SHAW
Trial Attorney
CHARLES G. LA BELLA
Deputy Chief
Fraud Section
U.S. Department of Justice
Criminal Division
1400 New York Ave., NW
Washington, D.C. 20005
(202) 616-2162

Dated:   Washington, D.C.
           August 6, 2015