UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | S4:14-cr-00272-JSR |
| | : | |
| PAUL ROBSON | : | |
| Defendant. | : | |

# UNITED STATES'S 5K LETTER AND SENTENCING MEMORANDUM REGARDING PAUL ROBSON

ANDREW WEISSMANN
Chief, Fraud Section
CAROL SIPPERLY
Senior Litigation Counsel
BRIAN R. YOUNG
Senior Trial Attorney
U.S. Department of Justice
Criminal Division
1400 New York Ave., NW
Washington, D.C. 20005
(202) 616-3114

JEFFREY D. MARTINO
Chief, New York Office
MICHAEL T. KOENIG
Trial Attorney
U.S. Department of Justice
Antitrust Division
450 5th Street, N.W.
Washington, D.C., 20001
(202) 616-2165



U.S. Department of Justice

Criminal Division

*Fraud Section*
*Bond Building*
*1400 New York Avenue, N.W.*
*Washington, D.C. 20530*

November 7, 2016

BY HAND AND ECF FILING

Chambers of the Honorable Jed S. Rakoff
U.S. District Court for the Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street Room 1340
New York, NY 10007

Re: United States v. Robson, No. 14-cr-00272

Dear Judge Rakoff,

The government respectfully submits this letter to advise the Court of the pertinent facts concerning the assistance that Paul Robson has rendered in the investigation and prosecution of others. In light of these facts, and assuming that the defendant continues to comply with the terms of his cooperation agreement, commits no additional crimes before sentencing, and appears for his sentencing as scheduled on November 14, 2016, the government intends to move, pursuant to Section 5K1.1 of the Sentencing Guidelines, for a downward departure in light of substantial assistance provided by Mr. Robson.

I. **BACKGROUND**

A. History and Characteristics of the Defendant

Paul Robson, 47, is presently employed as a salesman for an electrical subcontractor in Essex, England. After completion of his C levels, Mr. Robson left school and began work at Rabobank. Mr. Robson traded cash on Rabobank's London desk and eventually because the bank's primary Japanese Yen London Interbank Offered Rate (LIBOR) submitter, meaning that he was responsible for estimating in good faith the interest rate at which Rabobank could borrow Yen on the inter-bank market and transmitting that number to the British Bankers' Association (BBA). Mr. Robson has no criminal history and all available evidence suggests that, this offense notwithstanding, he is an upstanding person.

B. Guilty Plea and Criminal Conduct

On August 18, 2014, Mr. Robson appeared voluntarily in the United States to waive extradition and enter a plea of guilty to the first count of an indictment charging him with

conspiracy to commit wire and bank fraud for his role in a scheme to manipulate LIBOR. At the time of his guilty plea and during the trial of co-defendants Anthony Allen and Anthony Conti, who were convicted by a jury in November 2015, Mr. Robson admitted that he and other Rabobank traders schemed to rig LIBOR by making submissions to the BBA that were calculated to benefit Rabobank's derivative positions rather than undertaking a good faith estimate of Rabobank's borrowing costs, which is what the definition of LIBOR required him to do. The Court heard evidence that derivatives traders regularly asked Mr. Robson to alter his LIBOR submissions to suit their positions and that Mr. Robson accommodated those requests. Mr. Robson testified that he understood that it was wrong to make submissions calculated to harm Rabobank's counterparties and was candid in admitting that he was not truthful when he gave testimony to the U.K.'s Financial Conduct Authority (which occurred long before his cooperation with the Department of Justice began). Tr. 614. As Rabobank's Global Head of Liquidity and Finance, Mr. Allen was Mr. Robson's supervisor and Mr. Robson testified that Mr. Allen approved of and encouraged his conduct. Tr. 323, 328, 341. Mr. Robson has been free on bond since his initial appearance and has committed no violations of the terms of his release.

      C. Sentencing Guideline Calculation

The United States submits that, before a departure for substantial assistance, Mr. Robson's adjusted offense level is 22, representing seven levels for a base offense under § 2B1.1(b)(1); fourteen levels for loss under § 2B1.1(b)(1)(H);[1] two levels for number of victims under U.S.S.G. § 2B1.1(b)(2)(A)(i); two levels for abuse of trust under § 3B1.3; and a three-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and (b). Because Mr. Robson has no criminal history, and is therefore in a Criminal History Category I, his sentencing Guidelines Range is 45-51 months in Zone D.

## II. **Mr. Robson's Cooperation**

Mr. Robson provided substantial assistance to the government in two meaningful ways. First, he assisted in the prosecution of Anthony Allen and Anthony Conti by providing compelling testimony at their trial in October 2015 and by submitting to two days' of cross-

---

[1] The United States submits that Mr. Robson should be held accountable for a loss of between $550,000 and $1,500,000, which is the loss enhancement that the Court applied for Messrs. Allen and Conti. The United States established its loss estimate for co-defendants Anthony Allen and Anthony Conti through the submission of a declaration by Federal Bureau of Investigation (FBI) analyst Kyle Dornbos and the Court ruled that this evidence was sufficient to support a loss of between $500,000 and $1,500,000. *See United States v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009) (district courts need not calculate loss with precision but need only make a reasonable estimate). The declaration was marked as Exhibit 226 and was filed at Dkt. 225. Rather than reproduce the arguments that it previously made in support of the proposition that the conspiracy caused a loss of approximately $1.1 million to Rabobank's counterparties, the United States rests on the points raised in part V(B) of the sentencing memorandum it submitted in support of Mr. Allen's sentencing. *See* Dkt. 225.

examination during a related *Kastigar* hearing held in December 2015. And second, the government used Mr. Robson's cooperation as leverage during plea negotiations with co-defendant Paul Thompson, who entered a plea of guilty in July 2016.[2]

Mr. Robson's cooperation in the Rabobank matter came at a great personal and financial cost. His cooperation began with his decision to waive extradition and appear voluntarily in the United States to enter a plea of guilty, which conserved judicial and prosecutorial resources in both the United States and the United Kingdom. Given the technical nature of a crime involving benchmark interest rates and derivative instruments (and the prosecutors' limited aptitude for understanding these concepts), Mr. Robson's cooperation involved more than a dozen proffer and trial preparation sessions in the United States and the United Kingdom. Mr. Robson agreed to meet wherever and whenever prosecutors proposed and on several occasions took time away from his job and family in Essex County to travel to the United States. The proffer sessions that occurred involved Mr. Robson sitting for hours in a conference room with prosecutors and agents reviewing trading data, audio recordings, and written electronic chats, which was something of a trial in and of itself. He tried his utmost to give complete answers to each question and, in the view of the prosecution team, was candid at all times. The trial itself was both physically and financially draining. Mr. Robson provided two days of testimony on direct and a withering cross-examination, which required the presence of his privately retained counsel. Notwithstanding these challenges, Mr. Robson was an effective witness. He was candid about his culpability and helped the jury to understand dozens of communications laced with lingo and technical trading language. Mr. Robson's explanations for how the scheme worked and why it was dishonest were persuasive.[3]

In addition to the merits phase of the trial, Mr. Robson was required to prepare for and testify at a *Kastigar* hearing held on December 16-17, 2015. The issue presented at that hearing was whether the government made use of testimony that the U.K. Financial Conduct Authority compelled from Messrs. Allen and Conti. Mr. Robson obtained access to transcripts of the defendants' testimony through the discovery process and, through no fault of his own, viewed the materials briefly. To prepare for the hearing, Mr. Robson met with the Department of Justice's "filter" counsel several times. The hearing itself required Mr. Robson to travel to New York to give testimony over two days. The legal and factual complexities of the matter required substantial involvement of Mr. Robson's retained counsel who, in addition to attending meetings with the Department of Justice, filed written submissions which were clearly the product of substantial research and resources. *See* Dkt. 203.

---

[2] The government would have called Mr. Robson as a witness against Mr. Thompson had he elected to proceed to trial and believes that Mr. Robson would have rendered full cooperation.

[3] While Mr. Robson's cooperation against Messrs. Allen and Conti was substantial and valuable, he cannot claim credit for discovering their participation in the scheme. Whereas Mr. Robson's first proffer session was in July of 2014, the government was aware of Allen's and Conti's involvement and culpability well before October 2013, when Rabobank entered into a Deferred Prosecution Agreement with the Department of Justice. Allen and Conti were in the Department's crosshairs long before Mr. Robson began his cooperation.

3

As demonstrated by the fact that his testimony held up under extensive cross-examination by highly skilled defense counsel, Mr. Robson gave truthful testimony through the trial and *Kastigar* process. Indeed, Mr. Robson's testimony was tested extensively by defense counsel, who made his veracity a theme of their defense. Unlike many cooperating witnesses in economic crimes cases, Mr. Robson was candid about his role in the scheme from the beginning of his cooperation with the Department of Justice and made no effort to "minimize" his role. This allowed prosecutors to use their time with Mr. Robson to discuss the merits of the case instead of devoting energy to convincing him to accept responsibility for his actions.

### III. Conclusion

As described above, Mr. Robson provided substantial assistance in connection with the prosecution of Anthony Allen, Anthony Conti, and Paul Thompson. The United States submits that Mr. Robson's cooperation involved three factors that merit special attention.

First, large scale economic crime conspiracies that harm U.S. markets, such as LIBOR rigging and the manipulation of the foreign exchange spot, often occur, in large part, overseas and successful prosecutions of these matters frequently rely on evidence provided by witnesses who live in foreign countries. The recruitment of foreign cooperating witnesses can be more difficult than the recruitment of American cooperators because the Department of Justice often has less leverage against overseas witnesses than it does over domestic witnesses. This is because it is often more difficult for U.S. law enforcement to employ investigative tactics calculated to "flip" potential witnesses – such as electronic surveillance, search warrants, and unannounced interviews – in foreign countries than in the United States. What's more, a criminal defendant in a foreign country who decides to delay or impede an investigation generally has more procedural options available to him or her, such as contesting extradition, which could take years.[4] Given the impediments to recruiting cooperating witnesses in foreign countries, the Court should assign considerable value to Mr. Robson's decision to waive extradition without undue delay, appear in the United States voluntarily, and render cooperation in the first LIBOR manipulation case charged in an American court. Because foreign witnesses with inside knowledge of the workings of an international economic crime will weigh the Justice Department's reduced leverage overseas against the benefits of a section 5K1.1 motion, the United States respectfully urges the Court to fashion a sentence that provides an incentive for other criminally culpable foreign nationals to come forward.

Second, Mr. Robson's cooperation consumed large amounts of time and financial resources, especially compared to other economic crime cases. As described above, Mr. Robson's cooperation involved more than a dozen meetings with prosecutors and involved several trans-Atlantic flights. Many of these meetings required substantial preparation time, which usually involved the review of electronic records and audio files supplied by prosecutors.

---

[4] While an application for Mr. Robson's extradition from the U.K. would almost certainly have been successful, his decision to appear voluntarily conserved resources and was of substantial value.

4

Mr. Robson spent hours on the stand testifying in two hearings: the trial itself and the *Kastigar* hearing that followed.  The legal and factual complexities of Mr. Robson's cooperation required frequent consultation with Mr. Robson's well-respected privately retained legal counsel in the United States and the United Kingdom.  While all indications are that counsel provided advice in the most efficient manner possible, it seems likely that Mr. Robson's legal expenses were burdensome.

      Third, the nature of the matter made Mr. Robson's cooperation an unusually stressful experience for a witness in an economic crime case.  Mr. Robson and his family received an anonymous letter at their home threatening repercussions for the testimony he gave as part of the case, which caused great alarm in Mr. Robson's household.  The entry of his guilty plea and testimony required Mr. Robson to navigate a legal system with which he was unfamiliar and to spend stretches of time in a foreign country away from his family.  The publicity surrounding this case brought Mr. Robson unwelcome notoriety which made him something of a celebrity in the swaps trading industry – the only vocation he had known since finishing secondary school.  This notoriety – in conjunction with a ban imposed by the Financial Conduct Authority – is a limitation on his employment prospects.

Very Truly Yours,

| | |
|---|---|
| ANDREW WEISSMANN | JEFFREY D. MARTINO |
| Chief, Fraud Section | Chief, New York Office |
| | |
| /s Brian R. Young | /s Michael T. Koenig |
| CAROL SIPPERLY | MICHAEL T. KOENIG |
| Senior Litigation Counsel | Trial Attorney |
| BRIAN R. YOUNG | U.S. Department of Justice |
| Assistant Chief | Antitrust Division |
| U.S. Department of Justice | 450 5th Street, N.W. |
| Criminal Division | Washington, D.C. 20001 |
| 1400 New York Ave., N.W. | (202) 616-2165 |
| Washington, D.C. 20005 | |
| (202) 616-3114 | |